Dianne Coffino
**Covington & Burling LLP**
New York Times Building
620 Eighth Avenue
New York, New York  10018-1405
(212) 841-1000

*Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

_____
                                            )
**In re:**                                  )    **Chapter 11**
                                            )
**MONEY CENTERS OF AMERICA, INC.,** *et al.,*)    **Case No. 14-10603 (CSS)**
                                            )    **(U.S. Bankruptcy Court,**
**Debtors.**                                )    **District of Delaware)**
                                            )
_____)    **Jointly Administered**
                                            )
**MICHAEL ST. PATRICK BAXTER, solely in**   )
**his capacity as Chapter 11 Trustee of Money** )
**Centers of America, Inc.,**               )
                                            )
         **Plaintiff,**                     )
                                            )    **Adv. Proc. No. _____**
**v.**                                      )
                                            )
**SHERB & CO., LLP,**                       )
    **805 Third Avenue**                    )
    **New York, NY 10022**                  )
                                            )
**and**                                     )
                                            )
**RBSM, LLP,**                              )
    **805 Third Avenue**                    )
    **New York, NY 10022,**                 )
                                            )
         **Defendants.**                    )
_____)

## COMPLAINT FOR BREACH OF CONTRACT AND PROFESSIONAL NEGLIGENCE

Michael St. Patrick Baxter, solely in his capacity as Chapter 11 Trustee ("Trustee") for Money Centers of America, Inc. ("MCA"), by and through his undersigned counsel, hereby brings this action, alleging as follows:

### NATURE OF THE ACTION

1. This case involves breaches of contract and acts of professional negligence by defendant Sherb & Co., LLP ("Sherb"). Sherb was MCA's outside auditor from at least 2005 through early 2013. Its professional obligation to MCA, memorialized in the parties' engagement agreements, included, among other things, obtaining "reasonable assurance about whether the financial statements are free of material misstatement . . . from . . . misappropriation of assets … ."

2. Sherb breached its contractual and professional obligations to MCA. Specifically, Sherb knew or should have known that MCA insiders were engaged in massive looting of MCA assets over an extended period. Sherb, however, failed in its duty to raise this issue in its audits of the company, or otherwise to report it to MCA's Board of Directors.

3. As a proximate result of Sherb's breaches of contract and professional negligence, looting by MCA management continued unabated for years and MCA suffered substantial damages. Through this lawsuit, the Trustee, as successor in interest to MCA, seeks to recover such damages on behalf of the MCA Chapter 11 estate.

4. Sherb itself is liable for the damages it caused. Defendant RBSM, LLP ("RBSM") is likewise liable. In or about December 2012, RBSM acquired substantially all of Sherb's assets and began carrying on substantially all of Sherb's operations. The acquisition

constituted a *de facto* merger under applicable law, such that RBSM became responsible for Sherb's outstanding liabilities, including its liability to the Trustee in this action.

## JURISDICTION AND VENUE

5. On March 21, 2014 ("Petition Date"), MCA commenced its reorganization case, captioned *In re Money Centers of America*, 14-10603-CSS, by filing a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

6. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) because it is related to MCA's Chapter 11 case, the specifics of which are referenced in paragraph 5. The proceeding is non-core. The Trustee consents to the entry of a final order or judgment by the bankruptcy judge.

7. Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1409(c).

8. Pursuant to the Amended Standing Order of Reference issued by the United States District Court for the Southern District of New York on January 31, 2012, the instant litigation is properly instituted in the bankruptcy court.

## THE PARTIES

9. By order dated April 28, 2014, the United States Bankruptcy Court for the District of Delaware approved the appointment of the Trustee to serve as the Chapter 11 Trustee for MCA and to exercise the functions, powers and duties of a Chapter 11 trustee set forth in the Bankruptcy Code. The Trustee is a citizen of the Commonwealth of Virginia.

10. Sherb is a certified public accountancy partnership licensed in the State of New York, with an office at 805 Third Avenue, New York, New York. Sherb is a citizen of the State of New York.

3

11.     RBSM is a limited liability partnership organized under the laws of the State of Pennsylvania, with an office at 805 Third Avenue, New York, New York.  On information and belief, RBSM is a citizen of the State of New York, the Commonwealth of Virginia, and the State of Florida.

12.     As noted, RBSM engaged in a *de facto* merger with Sherb in or about December 2012.  A press release announcing the transaction, dated March 9, 2013 ("Acquisition Press Release"), stated that RBSM "has acquired the accounting practice of Sherb & Co[.] LLP. . . . The combined firm will operate under the RBSM LLP name."

13.     Pursuant to the *de facto* merger, RBSM's headquarters is now currently located at 805 Third Avenue, New York, New York, the same address as Sherb's headquarters.

14.     During 2013, following the *de facto* merger between RBSM and Sherb, at least twenty-three publicly traded Sherb clients filed Form 8-Ks with the Securities and Exchange Commission ("SEC") announcing that they were retaining RBSM as their certifying accountant.  According to these filings, Sherb "informed" each company that "it has combined its practice with RBSM LLP (the 'Merger') effective January 1, 2013."  Each filing attached a letter from Sherb to the SEC stating that Sherb "agree[s] with the statements concerning our Firm in . . . [the] Form 8-K," including the description of the transaction between Sherb and RBSM as a "[m]erger."  Upon information and belief, the clients that filed the Form 8-Ks referenced herein represent the majority of Sherb's clients prior to the *de facto* merger.  Upon information and belief, RBSM stepped into the shoes of Sherb and performed Sherb's contractual obligations to the former Sherb clients.

15.     At least five high-ranking former Sherb employees, including Steven Sherb, joined RBSM as part of the *de facto* merger between RBSM and Sherb.  Under the terms of the

4

RBSM partnership agreement they signed ("RBSM Partnership Agreement"), Steven Sherb received a 40% interest in RBSM. Steven Sherb's 40% interest was the largest stake in RBSM at the time. Christopher Valleau, Emmanuel Tzagarakis, and Mark Mycio — each employed by Sherb at the time of the *de facto* merger — also received interests in the RBSM partnership. Pursuant to the *de facto* merger, the combined stake in RBSM of Steven Sherb and the other Sherb partners exceeded 50 percent. Section 4.2.2 of the RBSM Partnership Agreement states that the "'Sherb Partners'" will contribute "accounts receivable and work in process to the [RBSM] Partnership as initial capital contributions."

16. On information and belief, Sherb has ceased operations and is winding down its business as a separate entity. That business is being effectively continued by RBSM pursuant to its *de facto* merger with Sherb. Sherb's ceasing of operations and wind down follows a determination by the Securities and Exchange Commission that Sherb, three of the four Sherb partners who became partners of RBSM, and a Sherb audit manager "engaged in improper professional conduct" in connection with the audits of the financial statements of several Sherb clients, and the SEC's imposition of a cease and desist order and other sanctions based on this misconduct.

**FACTUAL BACKGROUND**

A.   **Sherb's Incompetent 2008 Audit**

17. MCA was in the business of providing certain financial services to casinos. Based on MCA's public filings, the company was insolvent since at least December 31, 2004. As of December 31, 2007, the company's liabilities exceeded its assets by more than $7.5 million.

18. As noted above, Sherb had been MCA's outside auditor since at least 2005. In May 2009, MCA engaged Sherb to conduct an audit of the company's consolidated financial statements as of December 31, 2008 ("2008 Audit"). The terms of Sherb's engagement are reflected in an engagement letter dated May 15, 2009 ("2008 Audit Engagement Letter").

19. Under the terms of the 2008 Audit Engagement Letter, Sherb was obligated to "obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (a) errors, (b) fraudulent financial reporting, (c) misappropriation of assets, or (d) violations of laws or regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity." It was also required to "inform [MCA] of any material errors or fraud that come to our attention." Sherb further committed in the 2008 Audit Engagement Letter to conduct its audit "in accordance with auditing standards generally accepted in the United States … ."

20. Sherb completed the 2008 Audit in or about October 2009, and issued an audit report dated October 13, 2009 ("2008 Audit Report").

21. Despite MCA's massive insolvency, MCA insiders engaged in substantial looting of MCA assets in 2008. This looting consisted of at least the following:

    a. MCA's Chief Executive Officer, Christopher Wolfington, caused MCA to pay substantial personal expenses, including a large number of personal credit card charges;

    b. Wolfington and Jay Walsh, MCA's Chief Financial Officer, caused MCA to transfer hundreds of thousands of dollars to certain real estate companies they owned and controlled ("Real Estate Entities"); and

   c. Wolfington caused MCA to transfer thousands of dollars in MCA funds to a relative, Harry Wolfington.

22. During the course of the 2008 Audit (as well as its earlier work for MCA), Sherb received detailed financial information concerning MCA, including documents that should have raised red flags regarding the looting referenced in paragraph 21 above. These documents include, but are not limited to:

   a. American Express statements reflecting that Wolfington was causing MCA to pay his personal credit card expenses; and

   b. documents evidencing that Wolfington and Walsh were causing MCA to "loan" MCA funds to the Real Estate Entities without obtaining Board approval and without providing any evidence that the Real Estate Entities were able to repay the "loans."

23. Sherb either knew of the looting referenced in paragraph 21 above but deliberately concealed it, or negligently failed to detect the looting, notwithstanding the red flags in its possession.

24. Sherb breached its contractual and professional duties to MCA by failing to report the massive looting of the company by MCA insiders in its 2008 Audit Report, or otherwise.

25. Throughout the period of the 2008 Audit, MCA's Board of Directors was comprised of a majority of independent directors. In May 2009, when the 2008 Audit began, the Board consisted of Christopher Wolfington, Jeremy Stein, Terry Contreras, Dennis Gomes, and John Ziegler. Only Wolfington was an MCA insider. When Sherb issued the 2008 Audit Report on October 13, 2009, the Board consisted of Messrs. Wolfington, Stein, Contreras, and Ziegler.

26. Had Sherb fulfilled its contractual and professional obligations to detect and report the looting of MCA by company insiders, MCA's independent directors would have been in a position to halt such looting. Because Sherb breached its duties, however, the looting continued unabated and MCA suffered substantial resulting damages.

B. **Sherb's Incompetent 2010 Audit**

27. In June 2011, MCA engaged Sherb to audit MCA's consolidated financial statements as of December 31, 2010 ("2010 Audit"). The terms of the engagement are reflected in an engagement letter dated June 6, 2011 ("2010 Engagement Letter").

28. Under the terms of the 2010 Engagement Letter, Sherb was obligated to "obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (a) errors, (b) fraudulent financial reporting, (c) misappropriation of assets, or (d) violations of laws or regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity." Sherb further committed in the 2010 Audit Engagement Letter to conduct its audit "in accordance with auditing standards generally accepted in the United States."

29. Sherb completed the 2010 Audit in or about March 2012, and issued an audit report on March 29, 2012 ("2010 Audit Report").

30. Despite MCA's massive insolvency, MCA insiders engaged in substantial looting of MCA assets in 2010. This looting consisted of at least the following:

    a. Chris Wolfington continued to cause MCA to pay a substantial amount of his personal expenses, including substantial personal credit card charges; and

    b. MCA insiders caused tens of thousands of dollars in MCA funds to be wired to accounts they controlled.

8

31. During the course of the 2010 Audit, Sherb received detailed financial information concerning MCA, including documents that should have raised red flags regarding the looting referenced in paragraph 30 above. Indeed, in March 2012, Michael Harrison, a Sherb employee, received a spreadsheet expressly listing $92,708.93 that Wolfington had misappropriated from MCA to pay his personal expenses.

32. Based on the foregoing, Sherb either knew or should have known, based on its work on the 2010 Audit, that MCA insiders were misappropriating MCA assets.

33. Sherb breached its contractual and professional duties to MCA by failing to report the massive looting of the company by MCA insiders, in its 2010 Audit Report, or otherwise. As a result, the looting continued unabated and MCA suffered substantial resulting damages.

## COUNT I—BREACH OF CONTRACT

34. The Trustee repeats and re-avers the allegations contained in paragraphs 1-33 above as if fully incorporated herein.

35. In the 2008 Audit Engagement Letter and the 2010 Audit Engagement Letter, Sherb agreed to perform its audits of MCA's financial statements competently and in accordance with auditing standards. Sherb also committed to "obtain reasonable assurance about whether the financial statements are free of material misstatement . . . from . . . misappropriation of assets . . .."

36. Sherb breached its obligations to MCA under the 2008 Audit Engagement Letter and the 2010 Audit Engagement Letter by failing to perform competent audits and to report the misappropriation of MCA assets by company insiders.

37. As a proximate result of Sherb's breaches of contract, the looting of company assets by MCA insiders continued unabated.

9

38. MCA suffered damages in excess of $1 million as a result of Sherb's breaches of contract.

39. By virtue of its *de facto* merger with Sherb, RBSM is jointly and severally liable for Sherb's breaches of contract.

## COUNT II—PROFESSIONAL NEGLIGENCE

40. The Trustee repeats and re-avers the allegations contained in paragraphs 1-39 above as if fully incorporated herein.

41. Sherb owed MCA a duty to conduct its audits in a competent manner, consistent with standards of ordinary care in the auditing industry.

42. Sherb breached its duty of care to MCA by failing to perform competent audits and to report the misappropriation of MCA assets by company insiders.

43. As a proximate result of Sherb's professional negligence, the looting of company assets by MCA insiders continued unabated.

44. MCA suffered damages in excess of $1 million as a result of Sherb's professional negligence.

45. By virtue of its *de facto* merger with Sherb, RBSM is jointly and severally liable for Sherb's tortious conduct.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee demands judgment against Sherb and RBSM as follows:

A. actual damages, including compensatory and consequential damages, in excess of $1 million, the precise amount of which shall be determined at trial;

B. an award of prejudgment interest in an amount to be determined at trial; and

C. such other relief, both at law and in equity, as may be just and proper.

New York, NY

Dated:  January 16, 2015 /s/ Dianne Coffino
Dianne Coffino
COVINGTON & BURLING LLP
New York Times Building
620 Eighth Avenue
New York, New York  10018-1405
(212) 841-1000

Benjamin J. Razi (*pro hac vice to be filed*)
Dennis B. Auerbach (*pro hac vice to be filed*)
COVINGTON & BURLING LLP
One CityCenter
850 10th Street, NW
Washington, DC  20001-4956
(202) 662-6000

*Counsel for Plaintiff*